**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| WILLIAM HIGGINS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| -vs- ) | Case No. CIV-05-936-F |
| ) | |
| OFFICE DEPOT, INC., ) | |
| ) | |
| Defendant. ) | |

**O R D E R**

Before the court is Defendant's Motion for Complete Summary Judgment, filed September 1, 2006 (doc. no. 45). Plaintiff has responded to the motion, and defendant has replied. Upon due consideration of the parties' submissions, the court makes its determination.

Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment shall be granted if the record shows that, "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The moving party has the burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In determining whether a genuine issue of material fact exists, the evidence is to be taken in the light most favorable to the non-moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). Once the moving party has met its burden, the

opposing party must come forward with specific evidence demonstrating that there is a genuine issue for trial. Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir. 1983).

Background

Plaintiff, William Higgins ("Higgins"), commenced the above-entitled action on August 12, 2005. In the Amended Complaint filed August 24, 2006 (doc. no. 6), Higgins alleges claims against defendant, Office Depot, Inc. ("Office Depot"), his former employer, under the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq*. ("FMLA"), and under the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq*. ("ADEA"). Plaintiff also alleges a state law claim for termination in violation of the workers' compensation laws. Office Depot, in its motion, seeks summary judgment on all claims. The following relevant facts are taken from the summary judgment record and are either undisputed or viewed in a light most favorable to Higgins.

Office Depot hired Higgins in 1997 as an account manager in its business services division in Oklahoma City, Oklahoma. At the time Office Depot hired Higgins, he was 44 years old. In 1998, Higgins was transferred to the position of vertical market specialist working as an outside sales representative. Exhibit 1 to Office Depot's motion, ¶¶ 2, 3. Higgins was responsible for school and government accounts. Exhibit 1 to Higgins' response, p. 38, ll. 3-19.

Prior to 2002, Higgins was one of Office Depot's top producers, completing each year at or above the 100% goal level, and he consistently received positive evaluations and generous bonuses for his work. Exhibit 2 to Higgins' response, ¶ 1. Higgins received an overall rating of "Exceeds Standards" for his work performance in 2001. Exhibit 15 to Higgins' response.

For 2001, Higgins' annual sales goal was over $4.2 million. Exhibit 2 to Office Depot's motion, ¶ 2. In December of 2001, Higgins received his annual sales goal for 2002. It totaled over $4.7 million. This figure was comprised of an "Adjusted Base"

2

or historical performance number, $4,203,319, an "Incremental" or growth number, $400,000 and an "Other" number, $100,000. Attachment 2 to Exhibit 2 to Office Depot's motion, Exhibit 1 to Higgins' response, p. 54, ll. 14-25. Higgins immediately informed his supervisor, Kelley Copeland ("Copeland"), District Sales Manager, that the adjusted base number had been incorrectly set. Higgins believed the number to be inflated. He advised Copeland that if the number had been correctly set, the addition of the Oklahoma County account at the beginning of the fourth quarter of 2001 (which would not have been included in the adjusted base number) would have been sufficient to satisfy the increase in his sales goal for 2002. Higgins also informed Tom Tedford ("Tedford"), the Regional Director of Sales for the Dallas region, which included Oklahoma, of his concern regarding the calculation of the adjusted base number. Despite his requests to Copeland and Tedford to adjust the number, no adjustment was made and Higgins' 2002 annual sales goal remained at over $4.7 million. Exhibit 1 to Higgins' response, p. 56, ll. 22-25, p. 57, ll. 1-25, p. 58, ll. 1-23, p. 61, ll. 21-25, p. 62, ll. 1-10, p. 63, ll. 19-21, p. 67, ll. 15-18, p. 68, ll. 9-23.

In the first few months of 2002, the majority of Higgins' time was spent working on the Oklahoma City Public Schools account. It was his largest single producing account. There were problems with respect to timely payment of invoices by The Oklahoma City Public Schools. Higgins' time was managed by the Office Depot credit department. Time that could otherwise be spent on generating new business and obtaining the 2002 sales goals was being spent on credit issues with the Oklahoma City Public Schools. According to Higgins, it was imperative, in order to achieve the incremental or growth goal, to obtain new business in the first few months of the year. Exhibit 1 to Higgins' response, p. 69, ll. 17-23, p. 71, ll. 1-25, p. 72, l. 1.

In June of 2002, Copeland removed the Oklahoma City Public Schools and other school business from Higgins and reassigned them to a "lower cost sales resource." Exhibit 1 to Higgins' response, p. 79, ll. 19-25, p. 89, ll. 8-19. Office Depot, however, allowed Higgins to solicit commercial accounts in Norman. Exhibit 1 to Higgins' response, p. 39, ll. 14-15, 21; p. 101, ll. 3-10; Exhibit 2 of Office Depot's motion, ¶ 5. Office Depot reduced Higgins' sales goal for 2002 from over $4.7 million to over $2.6 million. However, only the monthly goals for third and fourth quarters were lowered. The first and second quarters were not reduced, despite the fact that Higgins had spent the majority of his time on the Oklahoma City Public Schools account. This left Higgins in a deficit. Attachment 3 to Exhibit 2 to Office Depot's motion, Exhibit 1 to Higgins' response, p. 85, ll. 5-11.

According to Higgins, after the accounts were removed from his responsibility, Copeland, for all practical purposes, stopped communicating with him. Exhibit 1 to Higgins' response, p. 79, ll. 24-25, p. 80, ll. 1-4.

On August 28, 2002, Copeland issued a letter of concern to Higgins. According to the letter, one of Copeland's concerns was "Performance vs. YTD goals." Exhibit 2 to Office Depot's motion, ¶ 6.

On September 11, 2002, Higgins sustained what appeared to be a minor injury at work. He hit the top of his head on the trunk of his vehicle while unloading a box of Office Depot catalogues at a meeting of school business officials. As it did not appear to be anything more than a bump and cut on the head, Higgins took no steps to notify the company of the incident. Subsequently, Higgins began experiencing numbness in his left arm and neck pain which required him to seek medical care. Exhibit 3 to Higgins' response, p. 32, ll. 1-24.

On November 1, 2002, Office Depot issued Higgins a performance improvement process ("PIP"). The PIP stated in part: "[Higgins] must achieve at least 80% actual sales performance to YTD goal and/or get 12 new accounts billing within

30 days effective 11/05/02." Attachment 1 to Exhibit 3 of Office Depot's motion. Subsequently, Higgins began reporting to a new supervisor, Chad Graham ("Graham"). Exhibit 3 to Office Depot's motion, ¶ 1.

Higgins did everything asked of him in the PIP for November, 2002. Exhibit 1 to Higgins' response, p. 125, l. 25, p. 126, ll. 1-6. The PIP, however, continued into December. Exhibit 1 to Higgins' response, p. 126, ll. 17-20. Higgins also met the criteria for the PIP in December. Exhibit 1 to Higgins' response, p. 141, ll. 1-7.

Office Depot set Higgins' annual sales goal for 2003 at $548,042. This goal was based upon a twelve month calendar year. The adjusted base number was $98,042 and the incremental or growth number was $450,000. Exhibit 3 to Office Depot's motion, ¶ 3; Attachment 2 to Exhibit 3 to Office Depot's motion.

Higgins received a "Needs Improvement" rating on his 2002 annual sales performance appraisal. Attachment 1 to Exhibit 1 to Office Depot's motion.

On February 4, 2003, Office Depot issued Higgins another PIP for his sales performance. Although the November PIP had required setting up a certain amount of billing accounts (which Higgins had accomplished), the February PIP required Higgins to obtain a percentage to goal. The standards were changed. The PIP stated: "[Higgins] is expected to meet established sales goals. But at least by 3-10-03 [Higgins] needs to be at 90% to his YTD sales goal." Attachment 4 to Exhibit 3 to Office Depot's motion, Exhibit 1 to Higgins' response, p. 141, ll. 1-21.

In mid-February of 2003, Higgins was advised by his doctors that he required surgery and that he would be off work for a minimum of six weeks. He notified Office Depot of the upcoming surgery. The next day, Graham offered Higgins a post-dated letter of resignation. Higgins refused the offer and applied for FMLA leave to begin March 3, 2003. Exhibit 1 to Higgins' response, p. 149, ll. 1-17; Exhibit 4 to Higgins' response, p. 4, ll. 8-11, p. 10, ll. 2-23, p. 46, ll. 18-24.

Before taking leave, Higgins inquired of Graham on a couple of occasions as to whether his annual quota would be pro-rated to reflect his time on FMLA leave. Graham agreed that it would be impossible to meet the annual quota if not pro-rated to reflect the FMLA leave, but could not give Higgins an answer as to whether the annual quota would be pro-rated. Exhibit 8 to Higgins' response, p. 5, ll. 6-17, Exhibit 9 to Higgins' response, p. 4, ll. 6-23.

In a conference call with Tedford and Graham on March 3, 2003, Tedford told Higgins with respect to the FMLA leave "don't work, take this time to make yourself better." Exhibit 4 to Higgins' response, p. 51, l. 13.

Higgins began a medical leave of absence on March 3, 2003. Exhibit 1 to Office Depot's motion, ¶ 5. During his leave, Higgins discovered that his medical problems were caused by his September 2002 work related injury and submitted a workers' compensation notice of claim. Exhibit 3 to Higgins' response, p. 39, ll. 1-11, Exhibit 1 to Higgins' response, p. 152, ll. 21-25, Exhibit 4 to Office Depot's motion, p. 153, ll. 1-8. Though originally scheduled to return from leave during the last week of May 2003, Office Depot granted Higgins a three and one-half week extension of his leave. Exhibit 1 to Office Depot's motion, ¶ 7.

Higgins returned from leave on June 20, 2003. Exhibit 1 to Office Depot's motion, ¶ 8. On July 11, 2003, Office Depot issued a PIP stating "[Higgins] is expected to make immediate improvement and sustained improvement in his performance. He needs to grow his daily sales by $350 per day" for 20 billing days. Attachment 5 to Exhibit 3 to Office Depot's motion.

In a telephone conversation on July 14, 2003, Tedford advised Higgins that his "numbers are looking a lot better." He also stated that "I feel good about your current position. I think you are doing all the right things." Exhibit 11 to Higgins' response, p. 4, ll. 6-7, p. 12, ll. 15-17.

Higgins had improved his sales from $819 per day in January 2003 to $1,750 per day by August 2003. Exhibit 3 to Office Depot's motion, ¶¶ 4, 9.

While Higgins had missed fifteen and one-half weeks of work, Higgins was advised that he had to proceed without expecting any relief from his annual sales quota for 2003. Attachment 6 to Exhibit 3.

On August 14, 2003, Office Depot terminated Higgins for failing to perform under the July 11, 2003 PIP. Exhibit 3 to Office Depot's motion, ¶ 9.

Although the July 11 PIP was built around daily sales "which is a fair metric that measures growth not % to plan," Higgins was told by Graham that he was not "on track to finish the year at 100 percent." Had Office Depot pro-rated the quota to reflect FMLA leave it would have put Higgins at 100% and within bonus range. Attachment 6 to Exhibit 3, Email Chain dated July 30, 2003, Exhibit 1 to Higgins' response, p. 169, ll. 9-12, p. 172, ll. 1-6, Exhibit 11 to Higgins' response, p. 5, ll. 8-14.

At the time of termination, Higgins was 50 years old. He was one of the oldest sales persons in his sales region. Exhibit 1 to Higgins' response, p. 187, ll. 8-25.

Discussion

I.  ADEA Disparate Treatment Claim -Prima Facie Case

Under the ADEA, an employer is prohibited from engaging in employment practices that "discriminate against any individual because of such individual's age." 29 U.S.C. § 623(b). A claim of age discrimination under the ADEA can be proven by either direct or circumstantial evidence. Stone v. Autoliv ASP, Inc., 210 F.3d 1132, 1136 (10th Cir. 2000). If there is no direct evidence of age discrimination, the court evaluates the ADEA claim under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973). Id. at 1137. In the instant case, Higgins does not proffer direct evidence of age discrimination. Therefore, the court will evaluate Higgins' claim under the McDonnell Douglas framework.

7

The McDonnell Douglas framework comprises three burden shifting steps. Initially, the burden rests with the plaintiff to establish a prima facie case of age discrimination. *Id*. at 802. If the plaintiff has established a prima facie case, the burden then shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for its employment action. *Id*. Finally, if the defendant articulates a nondiscriminatory reason, then the burden shifts to the plaintiff to show that the proffered reason is merely a pretext for age discrimination. *Id*. at 804.

To establish a prima facie case of age discrimination, the plaintiff must show that: (1) he was within the age group protected by the ADEA; (2) he was performing his job satisfactorily; (3) he was terminated, and (4) he was replaced by a younger person. McKnight v. Kimberley Clark Corp., 149 F.3d 1125, 1128 (10th Cir. 1998). In its motion, Office Depot contends that Higgins is unable to establish the prima facie case because he cannot show that he was performing satisfactory work at the time of his termination and he cannot show that he was replaced by a younger person. In regard to the former, Office Depot asserts that in the span of nearly ten months, it placed Higgins on multiple PIPs. Higgins' failure to perform under the final July 2003 PIP ultimately resulted in his termination. As to the latter, Office Depot contends that no one replaced Higgins. His accounts were spread out among other sales representatives. According to Office Depot, spreading out Higgins duties among the remaining employees does not constitute a replacement of Higgins' position.

In MacDonald v. Eastern Wyoming Mental Health Center, 941 F.2d 1115 (10th Cir. 1991), the plaintiffs asserted that their discharge was the result of age discrimination in violation of the ADEA. The district court ruled that plaintiffs had not made out a prima facie case of age discrimination, basing its conclusion on defendant's proffered nondiscriminatory reasons for plaintiffs' termination. The Tenth Circuit, on appeal, held that the district court had misapplied the law. The court

8

concluded that ruling that the plaintiffs did not establish a prima facie case based on defendant's reasons for their discharge,

> "raises serious problems under the McDonnell Douglas analysis, which mandates a full and fair opportunity for a plaintiff to demonstrate pretext. Short-circuiting the analysis at the prima facie stage frustrates a plaintiff's ability to establish that the defendant's proffered reasons were pretextual and/or that age was the determining factor; if a plaintiff's failure to overcome the reasons offered by the defendant for discharge defeats the plaintiff's prima facie case, the court is then not required to consider plaintiff's evidence on these critical issues."

*Id.* at 1119. The Tenth Circuit therefore held that the employer's reasons for the adverse action are not "appropriately brought as a challenge to the sufficiency of [the plaintiff's] prima facie case." *Id.* at 1120 (quoting Yarbrough v. Tower Oldsmobile, Inc., 789 F.2d 508, 512 (7th Cir.1986)). Rather, the employer's evidence is properly considered in addressing whether those articulated reasons are legitimate or merely a pretext for discrimination. The Tenth Circuit concluded that a plaintiff may make out a prima facie case of discrimination in a discharge case by credible evidence that plaintiff continued to possess the objective qualifications plaintiff held when plaintiff was hired, or by plaintiff's own testimony that plaintiff's work was satisfactory, even when disputed by the employer, or by evidence that plaintiff had held the position for a significant period of time. *Id.* at 1121 (citation omitted).

Applying that analysis in the case at bar and viewing the evidence in a light favorable to Higgins, the court finds that there is credible evidence in the record to raise a genuine issue of fact as to whether Higgins continued to possess the objective qualifications when he was hired and that he had held his position for a significant period of time. *See*, Exhibit 11 to Higgins' response, p. 6, ll. 19-23, p. 12, ll. 15-17, Exhibit 1 to Office Depot's motion, ¶ 3, Exhibit 3 to Office Depot's motion, ¶ 9. In the court's view, Higgins has presented sufficient evidence to raise a genuine issue of fact as to the second element of the prima facie case.

As stated, Office Depot also challenges Higgins' ability to establish the fourth element of the prima facie case, i.e., that he was replaced by a younger person. The court, however, concludes that Higgins has presented evidence adequate to raise a genuine issue of fact as to whether he was replaced by a younger person. *See*, Exhibit 2 to Higgins' response, ¶ 2.

With evidence in the record to establish genuine issues of fact as to the second and fourth elements of the prima facie case and there being no challenge by Office Depot as to the first and third elements, the court concludes that Higgins can overcome summary judgment as to the prima facie case of his age discrimination claim.

II. FMLA Retaliation Claim -Prima Facie Case

Office Depot next contends that Higgins has insufficient evidence to support his retaliation claim under FMLA. The McDonnell Douglas framework also guides the court's review of this claim. Metzler v. Federal Home Loan Bank of Topeka, 464 F.3d 1164, 1170 (10th Cir. 2006) ("Retaliation claims under the FMLA are subject to the burden-shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 [ ] (1973).") To establish a prima facie case of retaliation under FMLA, Higgins must show that (1) he engaged in a protected activity; (2) Office Depot took an action that a reasonable employee would have found materially adverse; and (3) there exists a causal connection between the protected activity and the adverse action. *Id*. at 1171. Office Depot does not challenge the first two elements of the prima facie case. Instead, Office Depot contends that Higgins cannot establish the third element of the prima facie case because he cannot show a causal connection between the protected activity of taking FMLA leave and Office Depot's decision to terminate Higgins.

Upon review of the record, the court concludes that Higgins has presented sufficient evidence to satisfy the prima facie case of his FMLA retaliation claim.

10

Higgins' employment was terminated a little less than two months after he used his FMLA leave. The Tenth Circuit has recognized temporal proximity between protected conduct and termination as relevant evidence of a causal connection sufficient to "justify an inference of retaliatory motive." O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (10th Cir. 2001). The court, however, has emphasized that a plaintiff may rely on temporal proximity alone only if "the termination is *very closely* connected in time to the protected activity." Anderson v. Coors Brewing, 181 F.3d 1171, 1179 (10th Cir. 1999). The court has concluded that one and one-half months between the protected activity and termination gives rise to a rebuttable inference of a causal connection, but that a period of three months does not. *Id*. The court has assumed without deciding that two months and one week suffices. *Id*.; *see also*, Webb v. Level 3 Communications, LLC, 167 Fed.Appx. 725 (10th Cir. January 25, 2006) (assuming two months is sufficient in itself to establish causation)[1]; Annett v. Univ. of Kansas, 371 F.3d 1233, 1240 (10th Cir. 2004) (concluding that a period of two to three months between the protected activity and the alleged retaliatory action was sufficient to establish causation). Although the Tenth Circuit has not definitely held whether approximately two months between the protected activity and the adverse action is sufficient in itself to establish causation, the court concludes, for purposes of this motion, that the evidence in this case (termination less than two months after protected activity) is sufficient to avoid summary judgment as to Higgins' prima facie case of retaliation under the FMLA.

III. Articulated Reasons for Higgins' Termination

Because Higgins presented sufficient evidence to raise genuine issues of fact as to the prima facie cases for his ADEA disparate treatment and FMLA retaliation claims, the burden shifts to Office Depot to articulate a non-discriminatory and non-

---

[1]This unpublished opinion is cited in accordance with 10th Cir. R. 36.3.

11

retaliatory reason for Higgins' termination.  Office Depot, in its motion, proffers that Higgins' failure to improve his poor sales performance, including his failure to perform under the July 2003 PIP, was the reason for his discharge from Office Depot.  Exhibit 3 to Office Depot's motion, ¶ 11; Office Depot's motion, p. 8.  Office Depot's reason for termination is legitimate, non-discriminatory and non-retaliatory reason.  The burden therefore shifts back to Higgins to demonstrate that the proffered explanation is a pretext for discrimination and for retaliation.

IV.  Pretext

Higgins can avoid summary judgment by presenting evidence sufficient to raise a genuine dispute of material fact regarding whether Office Depot's articulated reason for its adverse employment action was pretextual.  *See*, Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147-149 (2000).  Higgins can show pretext by revealing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Office Depot's] proffered legitimate reason[] for its action [such] that a reasonable factfinder could rationally find [it] unworthy of credence and hence infer that [Office Depot] did not act for the asserted non-discriminatory [or non-retaliatory ] reason[]."  Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997) (citations and quotations omitted).  Although it is a close case, the court finds that the following evidence creates inferences which are sufficient to raise a genuine issue of material fact as to whether Office Depot's proffered reason for its employment decision was pretextual.

1.   For 2001 year, Higgins received an "Exceeds Standards" overall performance rating.

2.   In December 2001, Higgins informed Copeland that his 2002 sales goal had been incorrectly set.  According to Higgins, the adjusted base number had been inflated.  Despite Higgins' request, the 2002 sales goal was not adjusted.

3.   In June of 2002, the majority of Higgins' accounts were removed and reassigned to "lower cost sales resources."

12

4. Higgins' 2002 sales goal was reduced. However, while the monthly goals for the third and fourth quarters of 2002 were lowered, the first and second quarters were not reduced (despite the earlier complaint of an incorrect adjusted base number and the time and effort Higgins spent on the Oklahoma City Public Schools account due to credit issues), which left Higgins in a deficit. Shortly thereafter, Copeland prepared a letter of concern, stating as a concern, "Performance vs. YTD goals." Subsequently, the November 1, 2002 PIP was issued, which referenced in part, the letter of concern and "performance vs. YTD sales goal."

5. Higgins did everything required of him under the November 2002 PIP in November and December. Tedford, Copeland and Graham orally praised him for his performance in a telephone conversation in December of 2002. Exhibit 5 to Higgins' response, p. 3, ll. 17-18, p. 10, ll. 13-14, 16-21.

6. Tedford told Higgins with respect to the FMLA leave "don't work, take this time off to better yourself."

7. Tedford told Higgins that he had made a slight improvement in his performance in a telephone conversation on March 3, 2003, the day Higgins' FMLA leave began.

8. Higgins had improved his sales performance from a rate of $819 per day in January 2003 to a rate of $1,750 per day in August 2003.

9. Tedford informed Higgins in a telephone conversation on July 14, 2003 that his numbers were "looking a lot better" and he was "doing all the right things." He also told him he "[felt] good about [Higgins] current position."

10. Higgins' 2003 sales goal had been calculated based on a 12-month calendar year. Higgins was off work due to FMLA leave from March 3, 2003 until June 20, 2003. Had Office Depot pro-rated the quota to reflect FMLA leave it would have put Higgins at 100% of his sales quota and within bonus range.

11. According to Higgins, he was asked, upon return from work from FMLA leave, to calculate the amount of new account sales for each remaining business day to achieve 100% of the original 2003 goal. The action plan Higgins prepared required $340 per day to achieve 100% of the 2003 goal. The PIP required $350 per day. Attachment 6 to Exhibit 3 to Office Depot's motion.

12. Although Office Depot contends that Higgins was not terminated for failure to meet the 2003 annual goal, Higgins was told by Graham he was not "on track to finish the year at 100 percent."

13. The day after Higgins informed Office Depot of his need for surgery, he was given an offer of a post-dated resignation letter by Graham.

With this evidence and the evidence raising genuine issues of material fact as to Higgins' prima facie cases, the court finds that Higgins' claims withstand Office Depot's summary judgment motion and that the ADEA disparate treatment and FMLA retaliation claims will proceed to trial.[2]

## V. Workers Compensation Retaliation Claim

Finally, Office Depot contends that Higgins cannot establish his workers' compensation retaliation claim. To establish a prima facie case of retaliatory discharge pursuant to Oklahoma's Workers' Compensation Act, Higgins must demonstrate (1) employment, (2) an on-the-job injury, (3) receipt of treatment under circumstances which would put the employer on notice that treatment has been rendered for a work-related injury, or that the employee instituted or caused to be instituted, proceedings under the Act, and (4) consequent termination. Buckner v.

---

[2] In its reply brief, Office Depot asserts that Higgins, in his response brief, has inappropriately attempted to assert an FMLA entitlement claim and contends that such claim fails as a matter of law. The court makes no determination at this time as to whether such claim has been pleaded by Higgins. The court also declines to make a determination as to whether such claim, if pleaded, fails as a matter of law because summary judgment was not requested on the claim in Office Depot's motion.

Gen. Motors Corp., 760 P.2d 803, 806 (Okla.1988). Office Depot asserts that Higgins cannot establish the second element of the prima facie case, an on-the-job injury. Specifically, it contends that under Oklahoma law, specifically, 85 O.S. § 24.2(A), there is a rebuttable presumption that an injury is not work related unless the employee gives oral or written notice to the employer within 30 days of the date of injury or the employee receives medical attention from a licensed physician during the thirty-day period from the date of injury.[3] Office Depot contends that Higgins failed to give notice or receive medical attention within 30 days of his injury and Higgins has no evidence other than his self-serving testimony to overcome the rebuttable presumption that the injury was not work related.

Citing to Anglen v. E.L. Powell & Sons, 812 P.2d 1364, 1367 (Okla. 1991), Higgins contends that a worker's failure to give timely notice under § 24.2 is excused where the injury from an accident does not become apparent until sometime after the accident. As in Anglen, Higgins asserts that the injury in this case did not appear serious or require treatment when it occurred. It was only later after experiencing numbness and neck pain that he sought medical treatment. Higgins then learned that his injury was caused by the September accident and he put Office Depot on notice of his intent to apply for workers' compensation. Higgins contends that, similarly to the employee in Anglen, he has demonstrated "good cause" as to why he failed to give notice of his injury or receive medical attention within 30 days. And because the

---

[3] 85 O.S. § 24.2(A) provides in pertinent part:

> Unless an employee . . . gives oral or written notice to the employer . . . within thirty (30) days of the date an injury occurs or the employee receives medical attention from a licensed physician during the thirty-day period from the date an injury occurred, the rebuttable presumption shall be that the injury was not work related. Such presumption must be overcome by a preponderance of the evidence.

15

question of whether an injury occurred in the course of employment is one of fact, Higgins contends that summary judgment is not appropriate.

Although Higgins argues that he has shown good cause for his failure to notify Office Depot of his injury or receive medical attention for the injury within 30 days, the court notes that the good cause excuse is no longer a part of § 24.2. *See*, Davis v. Southwestern Bell Telephone, 139 P.3d 892, 896 (Okla. 2006). Legislative amendment in 1997 to § 24.2 resulted in the removal of the good cause excuse and the trial court's discretion to find good cause shown. *Id*. Thus, Higgins cannot be excused from the rebuttable presumption that the injury is not work related.

Under § 24.2(A), the presumption that Higgins' injury was not work related must be rebutted by a preponderance of the evidence. Although Office Depot contends that Higgins' testimony is not sufficient to establish that his injury was work related and Higgins suggests that it is, the court concludes that the parties have not adequately addressed the issue with authority and argument. Without the benefit of citation and discussion of authority as to what evidence is sufficient to demonstrate that Higgins' injury was work related, the court, at this juncture, concludes that Higgins has satisfied the on-the-job element of his prima facie case. As Office Depot has not challenged any other element of the prima facie case, the court concludes that Higgins has demonstrated a prima facie case for his retaliatory discharge claim.

Pretext

After a prima facie case of retaliatory discharge is established, the burden shifts to Office Depot to rebut the inference that its motives were retaliatory by articulating that Higgins' termination was for a legitimate non-retaliatory reason for the discharge. Buckner, 760 P.2d at 806. As previously discussed in regard to the ADEA disparate treatment and FMLA retaliation claims, Office Depot has offered credible evidence of a legitimate non-retaliatory reason for the discharge. As Office Depot has carried its burden of production, the presumption of retaliatory discharge has been

successfully rebutted. *Id*. at 807. To avoid summary judgment, Higgins must show that a genuine issue of material fact exists concerning whether Higgins has shown that either his discharge was significantly motivated by retaliation for his exercise of statutory rights, or that Office Depot's proffered explanation for its adverse employment decision is unworthy of credence. Bishop v. Hale-Halsell Co., Inc., 800 P.2d 232, 234 (Okla. 1990).

As previously discussed, the court concludes that Higgins has presented sufficient evidence to raise a genuine issue of fact as to whether Office Depot's proffered explanation for Higgins' discharge is unworthy of credence. Therefore, Higgins' retaliatory discharge claim will proceed to trial.

Conclusion

Based upon the foregoing, Defendant's Motion for Summary Judgment, filed September 1, 2006 (doc. no. 45), is **DENIED**.

DATED January 19, 2007.

_____
STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

05-0936p016(pub).wpd